

# NUMBER 13-16-00370-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JEFFERY PEACE AND
CAROLINE PEACE,                                                    Appellants,

v.

ITCOA, LLC D/B/A
INDEPENDENCE TITLE COMPANY;
MONA McMAHAN; AND
WM. BRIAN McMAHAN, P.C.,                                          Appellees.

## On appeal from the 261st District Court
## of Travis County, Texas.

# MEMORANDUM OPINION[1]

---

[1] This appeal was transferred to this Court from the Third Court of Appeals by order of the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 22.220(a) (West, Westlaw through 2017 1st C.S.) (delineating the jurisdiction of appellate courts); *id*. at §73.001 (West, Westlaw through 2017 1st C.S.) (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer).

## Before Justices Rodriguez, Longoria, and Hinojosa
## Memorandum Opinion by Justice Hinojosa

Appellants Jeffery Peace and Caroline Peace, the purchasers of real estate in the City of Westlake Hills, Texas (the City), appeal from a final judgment providing that they take-nothing from appellees Independence Title Company (ITC), Mona McMahan, and Wm. Brian McMahan, P.C. (collectively the McMahans).[2]  In two issues, the Peaces complain that the trial court erred in (1) granting the motions for summary judgment, advanced on no-evidence and traditional grounds, filed by ITC and the McMahans; and (2) denying their motion for partial summary judgment.   We affirm.[3]

### I. BACKGROUND[4]

The facts of this case are largely undisputed and generally begin with an oral promise to the City by Amy Hovis to donate a fifteen foot right-of-way for expansion of a roadway from property that Hovis later sold to the Peaces for $635,000 and which is the subject of this suit on appeal.   The summary-judgment record reveals that the City agreed to partition Hovis's single lot into two lots in exchange for Hovis's donation.   The

---

[2] After the trial court signed the final judgment and the Peaces filed their notice of appeal, the City filed its own notice of appeal.   It has since filed with us a motion for voluntary dismissal.   See TEX. R. APP. P. 42.1(a), (b).   We grant the City's motion for voluntary dismissal and dismiss it from this appeal. Additionally, Alan Bojorquez, David Claunch, and Robert Wood, while listed on the style of the final judgment and notices of appeal and in the style of this case in this Court, are not parties to this appeal. Accordingly, we remove the City, Bojorquez, Claunch, and Wood from the style of this case. Lastly, the Peaces' brief fails to assail the take nothing relief awarded in Chicago Title Insurance Company's favor; accordingly, we remove it from the style of this case.

[3] The Peaces filed a motion for rehearing, which we denied.   On the panel's own motion it withdraws its initial memorandum opinion and judgment and replaces them with the instant memorandum opinion and accompanying judgment.

[4] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.   See TEX. R. APP. P. 47.4.

outline of this agreement was written in the minutes of an August 20, 2011 city council meeting. Approximately a month later, the City partitioned the lots by filing a plat vacation with the Travis County Clerk. The partition created two parcels of land that face opposite roads—101 McConnell Drive and 102 Westhaven Drive. A drawing of the property provided by the Peaces' in their summary-judgment response depicts the following:



Hovis never reduced her oral donation offer to writing. Instead, Hovis entered an agreement to sell the property to the Peaces for $635,000, without first transferring the right-of-way.

ITC furnished a title commitment on the property, and the McMahans served as ITC's agents. According to the summary-judgment evidence, Hovis, ITC, and the

3

McMahans did not inform the Peaces of the right-of-way agreement before they closed on the property. Nevertheless, during the purchase-option period, the Peaces were made aware of the possibility of a roadway expansion. On October 19, 2011, Hovis's real estate agent forwarded to the Peaces an email message from Jean Goehring, Hovis's husband, which apprised the Peaces of the possible roadway expansion:

> I know that title and survey review period begins today, and I wanted to pass [on] a drawing that I prepared to illustrate for Jeff and Carrie [Peace] a proposed right of way for 101 McConnell in the event of a possible expansion of Bee Cave. The expansion of Cave Rd. has been discussed for the past 15 or so years and would require the acquisition of right of way for the entire length of Bee Cave Rd.—including the dozens of commercial owners. This was discussed when we acquired 101 Westhaven and 102 Westhaven and when Chris and Gerri bought 100 Westhaven. Any expansion would also require the consent of the other 3 residential property owners adjacent to 101 and all have said no. No building setbacks would be affected and we are really talking about a few feet inside the steel fence that is currently there. If Jeff has any questions, please have him call me at the number below . . . .
>
> As you know, I'm currently on City Council and can share any past or present info on this . . . .

The uncontroverted summary-judgment evidence revealed that the day before closing, Hovis's real estate agent again informed the Peaces of the possible roadway expansion, directly writing to them:

> Congrats on your imminent two closings tomorrow. I left you a voicemail today Jeff [Peace] regarding this "right of way" outlined in the email sent 10/19 on the McConnell lot. (see attached survey)
>
> Apparently, it's not in writing anywhere (nor recorded) with the city of Westlake (the red lines drawn on survey.) There may be a time they attempt to put it in writing with you the new owner, but don't know when or if that will ever happen.
>
> Could be to your advantage, but nonetheless wanted you to know.

4

> Amy signed her paperwork today, so it'll just be a matter of funding tomorrow.

> Look forward to seeing you both once you're down here. Call at anytime if you need me.

After the sale, according to the summary-judgment evidence, the City sought to have the Peaces effectuate Hovis's oral promise; the Peaces declined the City's request. On October 23, 2012, the City's mayor wrote to the Peaces, recounting the following:

> Please sign the enclosed Right of Way Warranty, have them notarized, and return them to City Planner Davin Fillpot at City Hall at 911 Westlake Drive. (The City offers Notary services for free at City Hall)

> If we have not received the signed and notarized documents by November 6, 2012, the City will take the necessary steps to undo the plat vacation that was approved on August 10, 2011. That will result in 102 Westhaven Drive and 101 McConnell Drive once again being combined into a single, legal lot.

The attached right-of-way warranty proposed a thirty-foot right-of-way rather than the fifteen feet Hovis had orally promised. According to the summary-judgment affidavit testimony from Caroline Peace, in 2013 the Peaces conducted several meetings to negotiate an agreement with various stakeholders, including Hovis, the City's mayor, the City's administrator, and city council members. No compromise was reached. On June 26, 2013, the City stamped "VOID" on the previously-filed plat vacation, attached it to an affidavit by the City secretary, and recorded the affidavit together with the voided plat vacation with the Travis County Clerk.

The Peaces sued, among others, ITC and the McMahans for common law fraud, fraud by nondisclosure, conspiracy to commit fraud, negligent misrepresentation, breach of fiduciary duty, and violations of the Texas Deceptive Trade Practices Act (DTPA).

5

Approximately a year after the Peaces filed suit, the City instituted condemnation proceedings in the probate court to obtain the land it deemed necessary for the roadway expansion. Later in the same proceeding against ITC and the McMahans, the Peaces asserted an inverse-condemnation claim against the City, contending that the filing of the June 26, 2013 affidavit and voided plat vacation constituted a taking of property without adequate compensation.

ITC and the McMahans sought summary judgment on no-evidence and traditional grounds on the contention that their failure to disclose Hovis's oral promise did not cause the damages for which the Peaces sought recovery. The Peaces sought summary judgment on traditional grounds on their breach of fiduciary duty claim.

The trial court granted ITC and the McMahans interlocutory summary judgments on all claims brought by the Peaces, and it denied the Peaces' motion for summary judgment on their claim for breach of fiduciary duty. The Peaces inverse-condemnation claim against the City was then tried to a jury, which awarded $297,000. The trial court signed a final judgment that incorporates the summary judgment orders, provides that the Peaces take nothing from ITC and the McMahans, and awards the Peaces inverse-condemnation damages in accordance with the jury's verdict. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

A motion for summary judgment may be brought on no-evidence or traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i). A motion for no-evidence summary judgment is equivalent to a motion for pretrial directed verdict, and we apply the same legal

6

sufficiency standard of review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g). Such a motion should be granted if there is no evidence of at least one essential element of the claimant's cause of action. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion, and if the non-movant produces evidence raising a genuine issue of material fact, summary judgment is improper. TEX. R. CIV. P. 166a(i). All that is required of the non-movant is to produce a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003); *Ortega*, 97 S.W.3d at 772.

"Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Ortega*, 97 S.W.3d at 772 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)); *see Forbes*, 124 S.W.3d at 172. Conversely, more than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *Forbes*, 124 S.W.3d at 172; *Ortega*, 97 S.W.3d at 772 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 825, 827 (Tex. 2005).

We review the trial court's granting of a traditional motion for summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi 2003, no pet.). When reviewing a traditional summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The movant bears the burden of proof, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When granting a "hybrid" summary judgment motion—a no-evidence and traditional summary judgment motion—we first employ the no-evidence summary judgment standard of review. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If summary judgment was not proper on no-evidence grounds, we then employ the traditional summary judgment standard of review. *See id*. We will affirm a summary judgment "if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Joe v. Two Thirty Nine J.V.*, 145 S.W.3d 150, 157 (Tex. 2004).

**B.     Applicable Law**

8

The parties concede, and we agree, that causation and damages[5] are common elements in all six of the claims asserted by the Peaces. The parties further concede, and we agree, that the Peaces' claims will depend on whether wrongful acts by ITC and the McMahans "proximately caused" damages to the Peaces, whereas the Peaces' DTPA claim implicates the distinct concept of "producing cause," as discussed below.[6]

Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Rodriguez–Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred. *Rodriguez–Escobar*, 392 S.W.3d at 113. There may be more than one proximate cause of an occurrence. *Del Lago Partners*, 307 S.W.3d at 774.

The Texas Supreme Court defined "producing cause" with respect to DTPA actions

---

[5] On original submission, we focused on ITC and the McMahans' ground relating to, as they worded it, "causation of damages" and did not address the additional ground relating to damages. In the Peaces' motion for rehearing, they argued that we erred in our causation analysis. Upon further review, we have determined that the Peaces failed to present legally sufficient evidence in response to ITC and the McMahans' no-evidence summary judgment ground regarding whether they sustained any damages, regardless of causation.

[6] *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (breach of fiduciary duty elements); *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001) (fraud by nondisclosure elements); *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (common-law fraud elements); *Operation Rescue–Nat'l v. Planned Parenthood*, 975 S.W.2d 546, 553 (Tex. 1998) (conspiracy to commit fraud elements); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (DTPA claim elements); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (DTPA claim elements); *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (negligent misrepresentation elements); *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied) (fraud by nondisclosure elements); *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 55 (Tex. App.—Fort Worth 2002, no pet.) (conspiracy to commit fraud elements).

as:

> a substantial factor in bringing about an injury, and without which the injury would not have occurred, [this definition] is easily understood and conveys the essential components of producing cause that (1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred.

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). Producing cause, like proximate cause, rests on proof of actual causation in fact; cause-in-fact is an element common to both. *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993).

A producing cause requires that the act be both a cause-in-fact and a substantial factor in causing the consumer's injuries. *Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 117 (Tex. 2004); *Brown v. Bank of Galveston*, 963 S.W.2d 511, 514 (Tex. 1998). Thus, to prove the act was a producing cause of injury, a consumer must prove that the defendant's deceptive act or omission (1) was an actual cause-in-fact of the plaintiff's injury; (2) but for the defendant's conduct, the plaintiff's injury would not have occurred; and (3) the act or omission was such a substantial factor in bringing about the plaintiff's injury that liability should be imposed on the defendant. *Prudential Ins. v. Jefferson Assocs.*, 896 S.W.2d 156, 161 (Tex. 1995); *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). There can be more than one producing cause. *See Ledesma*, 242 S.W.3d at 45. Further, the defendant's deceptive act or practice must have been committed in connection with the plaintiff's transaction in purchasing goods or services. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996). A plaintiff can show the connection by showing that a representation made by the defendant reached the plaintiff. *See, e.g., Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex. App.—

10

Dallas 2005, no pet.).   The fact that a consumer's own acts may be a cause of the buyer's damages does not preclude finding that another's act is also a producing cause.   *Danny Darby Real Estate, Inc. v. Jacobs*, 760 S.W.2d 711, 716 (Tex. App.—Dallas 1988, writ denied).

Furthermore, a plaintiff asserting a DTPA claim does not have to meet the higher standard of proximate causation, which includes foreseeability as an element; rather, "only [a] producing cause must be shown."   *Prudential Ins.*, 896 S.W.2d at 161; *see Bryant v. S.A.S.*, 416 S.W.3d 52, 65 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

## C.   Issue 1:      Damages and Causation

### 1.   Damages

In the Peaces' response to the summary judgment ground regarding damages, they asserted that they were entitled to direct economic damages as a result of their "fraudulent inducement/misrepresentation cases."   According to the Peaces, these direct economic damages are measured in "out-of-pocket" and "benefit-of-the-bargain" terms. The Peaces also asserted entitlement to consequential damages.   Because ITC and the McMahans do not quarrel with these damage measures, we assume, without deciding, that they apply.

An out-of-pocket measure of damages derives from a restitutionary theory while the benefit-of-the bargain measure of damages derives from an expectancy theory. *Zorilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007)).   Out-of-pocket damages are measured by the difference between the value expended versus the value received, thus allowing

11

the injured party to recover based on the actual injury suffered. *Id*. Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised. *Id*. Regarding consequential damages, the Texas Supreme Court has written:

> Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts. They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it.

*Basic Capital Mgmt., Inc. v. Dynes Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011) (citing *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998)).

As evidence regarding damages, the Peaces referred the trial court to their deposition and affidavit testimony and to correspondence prepared by their counsel to Hovis, members of the city council, and the City's attorney. Caroline's deposition testimony provides:

> Q.     All right. What damages are you alleging that my client, Independence Title Company, owes you and your husband?
>
> A.     Sorry. I would say the value of the lot—the lot—the value of the property when we purchased it, the house and what we believe to be the separate legal lot, and the difference of basically the moment we signed on the line and what we actually got which is a bunch of—a legal mess.

In Jeffery's deposition, he testified that, "[h]ad Independence Title told us that there was a 15-foot right-of-way plus a five-foot utility easement attached to my lot I wouldn't be in this mess. I would never voluntarily—I would not have purchased my lot and—and be

12

put in this position." Neither Caroline's nor Jeffery's testimony provide the value expended versus the value received, the difference between the value as represented and the value received, or whether such damages were foreseeable and directly traceable to the wrongful act.[7] *See Zorilla*, 469 S.W.3d at 153; *Basic Capital*, 348 S.W.3d at 901. Accordingly, the Peaces' testimony failed to present legally sufficient evidence regarding out-of-pocket, benefit-of-the-bargain, or consequential damages.

The correspondence from the Peaces' counsel to Hovis, members of the city council, and the City's attorney states, in relevant part, the following:

> The claims set forth in this letter do not, by any means, constitute an exclusive list of the legal and equitable claims that Mr. and Mrs. Peace may bring if this matter is not swiftly resolved. In plain English, the Peaces hereby demand that the Sellers make good on their obligations to indemnify, defend and protect them from any and all losses occasioned as a result of the failure to disclose these issues in connection with the sale, including the loss of value and utility to the Property, as well as all attorney fees and out-

---

[7] The paragraphs referenced in Caroline's and Jeffery's affidavit testimony regarding damages are identical. They provide:

In early 2012, we began to learn that the City had an expectation that a portion of the McConnell Property would be donated to the City for use in connection with the widening of Bee Caves Road, and that this expectation was based on certain dealings between the City and Hovis that occurred prior to our involvement with the property. Between February 8, 2012 and June 26, 2013, we met and interacted numerous times with City officials in an effort to understand and resolve the issues that are now the subject of this lawsuit. Much of this time was spent gathering facts and trying to persuade the City that we had no prior knowledge of the proceedings at the August 10, 2011 City Council meeting, or any other pre-closing dealings or negotiations between the City and Hovis. Our meetings with the City included . . . .

In most of our meetings and correspondence with City officials during this period, the City threatened to undo, reverse, or nullify the 2011 document entitled Vacation of Plat (a true and correct copy of which is included in Plaintiffs' Appendix as Exhibit 13) unless we donated a portion of the McConnell Property to the City as Defendant Amy Hovis had promised. By way of example only, during the meeting on April 9, 2013, Mayor Claunch led a discussion about a potential property donation, in which he repeatedly indicated that the City intended to undo the plat vacation unless the City received the property donation that Hovis had promised. In the same discussion, the Mayor described the potential move as "leverage" and "going to war." My testimony in this paragraph . . . is based on my personal knowledge and recollection, and on my review of audio recordings of the meetings that took place on January 8, 2013, April 9, 2013, and May 7, 2013.

13

of-pocket costs incurred by the Peace family in connection therewith. As of October 11, 2013, the Peaces have incurred approximately $4,959.69 in attorney fees and expenses, and continue to incur them on a near-daily basis.

Neither ITC nor the McMahans objected to the trial court's consideration of the correspondence. In a footnote in the Peaces' response to the summary judgment motions, they stated that they "are presently consulting with damages experts, and they expect to retain and identify one or more damages experts by the June 15, 2015 deadline in the parties' Agreed Discovery Control Plan."

We conclude that, as the non-movants, the Peaces failed to present the trial court with legally sufficient evidence in support of their request for out-of-pocket, benefit-of-the-bargain, or consequential damages. *See* TEX. R. CIV. P. 166a(i). Neither the Peaces' deposition nor their affidavit testimony create a question of material fact regarding how a factfinder would determine the diminution in value, if any, to the property that they purchased from Hovis. Their testimony focuses on post-purchase legal wrangling, which as detailed below is legally insufficient. Further, while the Peaces' response alluded to seeking "damages experts," they failed to move for a continuance until such experts could be retained and provide evidence on the topic of damages in the summary judgment proceeding. *See* TEX. R. CIV. P. 166a(g) ("Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may . . . order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.").

Lastly, we turn to the Peaces' reference to $4,959.69 in attorney's fees. Although

14

not referenced by any party, we find the Texas Supreme Court's opinion in *In re Nalle Plastics Family Ltd. Partnership*, 406 S.W.3d 168 (Tex. 2013), instructive. In it, the court reiterated that generally "suits cannot be maintained solely for the attorney's fees; a client must gain something *before* attorney's fees can be awarded." *Id*. at 173 (emphasis in original) (quoting *MBM Fin. Corp. v. Woodlands Operating Co., L.P*., 292 S.W.3d 660, 663 (Tex. 2009)). It further held that "[i]f the *underlying* suit concerns a claim for attorney's fees as an element of damages, as with [a law firm's] claim for unpaid fees . . . , then those fees may properly be included in a judge or jury's compensatory damages award." *Id*. at 175 (emphasis in original).

Under *Nalle Plastics*, the Peaces must show either that at least one of their claims escape summary judgment independent of their request for attorney's fees, *see id*. at 173 (providing that "a client must gain something *before* attorney's fees can be awarded"), or that attorney's fees is an element of the damages that they seek. *See id*. at 175 (providing that if the underlying suit concerns a claim for attorney's fees as an element of damages, as with a law firm's claim for unpaid legal fees, then those fees may properly be included in a judge or jury's compensatory damages award). While the Peaces maintain that they purchased "a legal mess," they point to no claim that independently escapes summary judgment, and they fail to direct us to any authority wherein their request for attorney's fees may be characterized as a compensatory damage under *Nalle Plastics*. *See id*. at 173, 175 ("While attorney's fees for the prosecution or defense of a claim may be compensatory in that they help make a claimant whole, they are not, and have never been, damages. Not every amount, even if compensatory, can be

15

considered damages.").

Viewing the evidence referenced by the Peaces in their summary judgment response in the light most favorable to them, we conclude that there was no more than a scintilla of evidence to support the damages element of their claims. *See City of Keller*, 168 S.W.3d 802 at 824.

### 2. Causation

ITC and the McMahans' also moved for a no-evidence summary judgment on the causation element.[8] Specifically, they argued that "the cause of any damages to [the Peaces] is the subsequent governmental taking and condemnation of part of their" property for the roadway expansion, and not any action taken or omission made by ITC or the McMahans.

In response to this no-evidence challenge, the Peaces argued that: (1) "[n]othing in the condemnation suit will remove the [June 26, 2013 affidavit and voided plat vacation] from the public records"; (2) even if the condemnation suit ended immediately,[9] they would still not know the correct legal description of their property; and (3) they would still be fighting with the City to clean up "the legal mess" that ITC and the McMahans sold them. The Peaces also argued that the condemnation argument was not ripe because the City did not institute the condemnation action until a year after the Peaces filed suit.

---

[8] Although a review of the evidence regarding causation is not necessary to the disposition in the instant memorandum opinion, on original submission we addressed ITC and the McMahans' challenge to the causation element. Given our previous memorandum opinion, we include our causation analysis as an alternative basis for affirming the final judgment and in the interest of transparency.

[9] At the time the summary-judgment motions were considered, the Peaces' inverse-condemnation claim was still pending.

16

As for the summary-judgment evidence regarding causation, the Peaces relied soley on deposition and affidavit testimony, detailed above, in which they steadfastly asserted that they would not have purchased the property had they known of Hovis's oral promise.[10]

The Peaces responsive legal argument focuses on blemishes on their chain of title while their attempt to create a fact dispute centers on their ultimate decision to purchase the property. But neither negates the effect of the City's condemnation action. Nonetheless, even assuming without deciding that the trial court erred in granting summary judgment on no-evidence grounds,[11] we find no error in the granting of summary judgment on ITC and the McMahans' condemnation contention on traditional grounds.

The final judgment in this case goes a long way toward disposing of the Peaces' responsive arguments. One of the judgment's paragraphs provides:

> 11. On April 4, 2016, the parties proceeded to trial on a single question regarding the amount of [the Peaces'] damages, if any, for the taking. On April 6, 2016, the question was submitted to the jury, which returned a verdict in favor of [the Peaces] in the amount of $297,000.00. Having been awarded compensation for the taking under the Texas constitution, [the Peaces'] federal takings claim under 42 U.S.C. § 1983 is moot. *See, e.g., Town of Flower Mound v. Stafford Estates*, 71 S.W.3d 18, 48-49 (Tex. App.—Fort Worth 2002), aff'd 135 S.W.3d 620 (Tex. 2004).

The Peaces take no issue with this paragraph, which resolves half of the Peaces' concern

---

[10] We note that neither the Peaces' original petition nor their live petition before the summary-judgment motions were considered sought rescission.

[11] In the Peaces' reply brief, they complain that ITC and the McMahans' condemnation argument should be characterized as an inferential rebuttal, and ITC and the McMahans could not obtain a no-evidence summary judgment on it. The Peaces also contend that ITC and the McMahans did not present the condemnation argument to the trial court; our reading of the record, as noted above, reveals otherwise. However, we assume, without deciding, that that ITC and the McMahans could not have obtained summary judgment on the condemnation argument on no-evidence grounds.

17

regarding the clarity of the legal description of their property.   The other half is resolved when we look to the City's condemnation action, which the Peaces reference by style and cause number in their summary-judgment response.   In that action, the City attached to its petition a metes and bounds description of the land it sought to condemn.[12]   Thus, on this record, the Peaces' concern about the correct legal description of their property—their only legal contention that ITC and McMahans caused them damages—has been answered.

In the Peaces' motion for rehearing they contended that we erred because a single harm can have more than one cause.   They further claimed that we have "shoehorned" the one-satisfaction rule into the causation analysis.   We respectfully disagree with the notion that our causation analysis is in tension with the one-satisfaction rule.   The recent Texas Supreme Court opinion in *Sky View at Las Palmas, LLC v. Mendez*, No. 17-0149, 2018 WL 2449349 (Jun. 1, 2018, reh'g pending), buttresses our causation analysis.   To be clear, questions of whether a plaintiff has sustained a single, indivisible injury and the trial court's application of the one-satisfaction rule are questions of law that we review de novo.   *See id.* at *4 & *4 n.8.   In *Mendez*, the court examined *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74 (Tex. 1993), a case dealing with a title company, writing:

> [In *Garrett*], we examined the contents of a settlement agreement and held that the nonsettling defendants were entitled to a settlement credit because it covered the same injury for which the jury found the nonsettling defendants liable.   The plaintiffs, the Garretts, purchased land for use as an automobile salvage yard but later learned the land was covered by a restrictive covenant prohibiting such use.   The Garretts sued the sellers for misrepresentations, and in a separate suit, sued two title companies for negligence and DTPA violations.   The Garretts settled with the sellers, and

---

[12] A copy of the City's petition and the attached property description were filed by the City in support of a summary judgment motion that is not at issue in this appeal.

18

though the title companies placed the settling defendants' settlement agreement into the record, the trial court denied the title companies' request for settlement credits. The court of appeals affirmed, holding that the title companies had not proved that they and the sellers were joint tortfeasors. This Court reversed. We observed that "[t]he settlement agreement shows that all parties denied any liability, but there are other statements addressing the merits of that lawsuit and what the settlement was intended to remedy." We then noted that the settlement agreement established that the Garretts' claims were based on the sellers' alleged misrepresentations and that they sought to recover "money, rescission of the sale of land . . . and attorney's fees." We held that the title companies were entitled to a credit against the judgment equal to the full amount of this settlement because "[b]y its terms, the settlement agreement covers the same injury for which the title companies were found liable in the present lawsuit." Further, "[a]lthough not adjudicated to be joint tortfeasors, the title companies and the sellers cannot reasonably be said to have caused separate injuries."

*Mendez*, 2018 WL 2449349, at *4 (citations omitted). While this present case does not deal with a settlement agreement, *Mendez's* discussion of a single, indivisible injury supports our causation analysis. The Peaces' concern about the correct legal description of their property constitutes a single, indivisible injury, and they presented no evidence that ITC or the McMahans caused it.

The Peaces' ripeness argument is equally unpersuasive because their concern regarding the clarity of title was ephemeral. While true that the City did not institute the condemnation proceeding until after the Peaces filed suit, its legal authority to do so existed throughout the relevant period. This point brings us back to the cause-in-fact element that pierces through the definitions of proximate cause and producing cause. *See Rodriguez–Escobar*, 392 S.W.3d at 113 (providing that for a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but

19

for the act or omission—the harm would not have occurred); *see also Prudential Ins.*, 896 S.W.2d at 161 (providing that to prove the act was a producing cause of injury, a consumer must prove that the defendant's deceptive act or omission (1) was an actual cause-in-fact of the plaintiff's injury; (2) but for the defendant's conduct, the plaintiff's injury would not have occurred; and (3) the act or omission was such a substantial factor in bringing about the plaintiff's injury that liability should be imposed on the defendant).

Even if Hovis's oral promise enticed the City and ITC and the McMahans were derelict in not relating Hovis's oral promise to the Peaces, the City possessed eminent domain power at all relevant times. That the City employed its eminent domain power only confirms that its will to acquire the land for a roadway expansion persisted after Hovis failed to fulfill her end of the bargain and was the but-for cause of the land taking that the Peaces resisted. *See Rodriguez–Escobar*, 392 S.W.3d at 113; *Prudential Ins.*, 896 S.W.2d at 161.

So even assuming the trial court erred if it granted a no-evidence summary judgment against the Peaces, we conclude that the trial court did not err in granting a traditional summary judgment on the ground that ITC and the McMahans' failure to disclose Hovis's oral promise did not cause the Peaces the damages that they sought through the six claims asserted. Accordingly, the Peaces' first issue is overruled.

## D.    Issue 2:   Breach of Fiduciary Duty

In the Peaces second issue, they complain that the trial court erroneously denied their motion for summary judgment on traditional grounds regarding their breach of fiduciary duty claim. In their brief before us, the Peaces enumerate the elements of a

breach of fiduciary duty claim; and for the causation element, they refer us to their briefing of causation regarding their first issue. In other words, the Peaces hinge the success of their second issue, in part, on their first issue. Having overruled the Peaces' first issue, their second issue necessarily fails. Accordingly, we overrule the Peaces' second issue.

### III. CONCLUSION

The judgment of the trial court is affirmed.[13]

LETICIA HINOJOSA
Justice

Delivered and filed the
18th day of October, 2018.

---

[13] The McMahans' motion to dismiss this appeal for lack of jurisdiction, which we carried with the case, is denied.